UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRACY EVANS,

    *Plaintiff,*

v.

NATIONAL RAILROAD PASSENGER
CORP., *d/b/a* AMTRAK,

    *Defendant.*

Case No. 1:24-cv-1984-RCL

## MEMORANDUM OPINION

This discovery dispute arises from Plaintiff Tracy Evans's claim of employment discrimination under the Americans with Disabilities Act ("ADA") against her former employer, Defendant National Railroad Transport Corp. ("Amtrak") for denying Evans a workplace accommodation that would let her work remotely. During the period between October 8, 2018, and June 12, 2024, Evans exchanged text messages with an Amtrak colleague, Stephanie McDade, about her interactions with Amtrak regarding her accommodation. In her discovery production, Evans redacted portions of those text messages pursuant to the common-interest/joint-defense privilege. Before the Court is Defendant's Motion to Compel production of the withheld messages. Mot. to Compel, ECF No. 20 ("Mot."). Because Evans has failed to provide evidence of a common-interest agreement and, in any event, disclaims having pursued a joint litigation strategy, the common-interest privilege does not justify withholding the text messages. Amtrak's motion will therefore be **GRANTED** by separate order.

1

I.  **BACKGROUND**

   a. **Key Facts**

Evans alleges that she worked for Amtrak from 2008 until approximately 2024. Am. Compl. ¶¶ 6–7, 23–24. Around December 2022, Evans experienced medical conditions that, according to the allegations in the Amended Complaint, caused her doctor to recommend she work from home.[1] *Id.* ¶¶ 10–14. Due to workplace practices established during the COVID-19 pandemic, Evans had been able to work from home without issue until around mid-2023, when she was ordered to return to in person work. *Id.* ¶ 16. She requested that Amtrak allow her to work from home in June 2023, but Amtrak refused, citing a collective bargaining agreement that disallowed working from home. *Id.* ¶ 16–17. Evans filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). *Id.* ¶ 21. After Evans was later terminated from her position, she filed a second EEOC charge. *Id.* ¶ 24.

Stephanie McDade also worked for Amtrak in crew management. *See* Compl. ¶ 7, *McDade v. National Railroad Passenger Corp.*, No. 1:23-cv-3801-AHA (D.D.C. Dec. 12, 2023) ("McDade Compl."); *see also* Ex. B. to Opp'n, ECF No. 25-3. And like Evans, McDade alleges that she experiences a medical condition that caused her physician to recommend she work from home. *Id.* ¶ 13. After Amtrak refused her request for an accommodation, citing the same collective bargaining agreement as with Evans, McDade filed an EEOC charge, McDade EEOC Charge, Ex. I to Opp'n, ECF No. 25-7. She later sued in federal court. *See* McDade Compl.

McDade and Evans began corresponding about Amtrak's unwillingness to meet their proposed accommodations by around June 2023. *See* Ex. G. to Pl.'s Opp'n at 2, ECF No. 25-8.

---

[1] Evans alleges that she was diagnosed with adjustment disorder, depression, and anxiety. *See* Am. Compl. ¶ 10. She alleges that adjustment disorder causes her to experience extreme fatigue, gastric symptoms, and fibromyalgia. *Id.* ¶ 12. She also alleges that she suffers from symptoms of Addison's disease. *Id.* ¶ 22.

Their conversations included discussion of who at Amtrak might be able to assist them, the applicable regulations they believed Amtrak was violating, and other potential legal considerations. *See generally id.* The next month, and indeed, on the same day — July 25, 2023 — both Evans and McDade hired the same law firm to represent them in legal proceedings against Amtrak. Declaration of Kathryn E. Averwater ¶¶ 1–2, ECF No. 25-1 ("Averwater Decl."). This dispute concerns certain of the text messages exchanged between Evans and McDade between July 20, 2023, and April 2, 2024, which Evans maintains should be protected from disclosure under the common-interest doctrine and the attorney-client privilege.

### b. The Discovery Dispute

On July 9, 2024, Plaintiff filed a Complaint in this case, alleging disability discrimination and retaliation in violation of the ADA. *See* ECF No. 1. She amended her complaint on January 3, 2025, *see* Am. Compl., and after Amtrak answered, *see* ECF No. 15, the parties proceeded to discovery. In interrogatory responses produced in this case on March 21, 2025, Evans identified McDade as a witness with whom she discussed her accommodation request. *See* Pl.'s Answers to Def.'s First Set of Interrogatories, Ex. A to Mot. at Nos. 10, 17, ECF No. 20-2. Evans's discovery responses did not include her communications with McDade, however, and Amtrak thus sent Evans a letter raising the deficiency. *See* Discovery Deficiency Letter, Ex. B to Mot., ECF No. 25-3. Evans then supplemented her discovery responses on June 26, 2025, invoking the common-interest doctrine to withhold certain text messages between her and McDade, which she identified in a privilege log. *See* Pl.'s Supp. Answers to Def.'s First Set of Interrogatories at Nos. 10, 17, Ex. C. to Mot., ECF No. 20-4; Privilege Log, Ex. D. to Mot, ECF No. 25-5.

Two weeks later, Evans produced more than 300 pages of text messages between her and McDade, spanning the period between October 8, 2018, and June 12, 2024. Many of those pages

contain redactions, which Evans asserts "are protected by co-plaintiff/attorney-client privilege" because she and McDade "discussed and coordinated their accommodation requests and discrimination charges at length and shared a common strategy." July 25, 2025 Email, Ex. E to Mot., ECF No. 20-6. She further asserted that "[t]he redacted texts are messages that are so intertwined with advice and communications to/from their mutual counsel that the texts are protected by attorney-client privilege." *Id.* An amended privilege log identifies approximately sixty pages, by the Court's count, of text messages containing information withheld under the common-interest doctrine. *See* Am. Privilege Log, Ex. F. to Mot., ECF No. 20-7.

Amtrak moved to compel production of the documents. The motion is now ripe, *see* Opp'n, ECF No. 25; Reply, ECF No. 26, and because Evans has not satisfied the stringent requirements of the common-interest doctrine, the Motion will be granted.

## II. LEGAL STANDARD

"When a party objects to a discovery request, the requesting party may — after first attempting to resolve the issue by conferring with the refusing party — file a motion to compel." *Campaign Legal Ctr. v. Iowa Values*, 710 F. Supp. 3d 35, 46 (D.D.C. 2024) (quoting *Lamaute v. Power*, 339 F.R.D. 29, 35 (D.D.C. 2021)). "Rule 37 permits a party to file a motion to compel discovery if, among other reasons, the opposing party . . . 'fails to produce documents . . . requested under Rule 34.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 37(a)(1), (a)(3)(B)(iv). "An incomplete answer or response is treated as a failure to respond." *Id.*

Motions to compel discovery are channeled through a burden-shifting framework. The moving party must make an initial showing that (1) "the requested information is relevant," and (2) "the opposing party's response . . . is inadequate or incomplete." *Id.* "After establishing

4

relevance and incompleteness, the burden shifts to the party opposing discovery to show why the discovery should not be permitted." *Id.* (internal quotation marks and citation omitted).

The parties in this case agree that the sole question on the motion to compel discovery is whether the text messages are privileged. "The burden is on the proponent of [a] privilege to demonstrate that it applies." *Fed. Trade Comm'n v. Boehringer Ingelheim Pharm., Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018). "The 'basis of [a] privilege' must be 'adequately established in the record' through evidence 'sufficient . . . to establish the privilege . . . with reasonable certainty.'" *In re Subpoena Duces Tecum Issued to CFTC*, 439 F.3d 740, 750 (D.C. Cir. 2006) (alterations in original) (first quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1303 (D.C. Cir. 1988), and then quoting *FTC v. TRW, Inc.*, 628 F.2d 207, 213 (D.C. Cir. 1980)). "To discharge this burden, the proponent of a privilege 'must adduce competent evidence in support of its claims' and 'must offer more than just conclusory statements, generalized assertions, and unsworn averments of its counsel.'" *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 127 (D.D.C. 2012) (quoting *In re Veiga*, 746 F. Supp. 2d 27, 33–34 (D.D.C. 2010)).

### III. DISCUSSION

"The attorney-client privilege protects the confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice." *In re Lindsey*, 158 F.3d 1263, 1267 (D.C. Cir. 1998). "The privilege is intended to encourage 'full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" *Swindler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

"The joint defense privilege, often referred to as the common interest rule, is an extension of the attorney-client privilege that protects from forced disclosure communications between two or more parties and/or their respective counsel if they are participating in a joint defense agreement." *United States v. Hsia*, 81 F. Supp. 2d 7, 16 (D.D.C. 2000). The privilege protects not just communications with counsel, but communications "between the parties," if they are "part of an on-going and joint effort to set up a common defense strategy" in connection with actual or prospective litigation. *Minebea Co. v. Papst*, 228 F.R.D. 13, 15 (D.D.C. 2005) (internal quotation marks omitted) (quoting *In re Bevill, Bresler & Schulman Asset Mgmt.*, 805 F.2d 120, 126 (3d Cir. 1986)). "The 'common interest doctrine,' in short, 'permits parties whose legal interests coincide to share privileged materials with one another in order to more effectively prosecute or defend their claims.'" *Georgia v. U.S. Dep't of Just.*, 148 F.4th 724, 733 (D.C. Cir. 2025) (quoting *Hunton & Williams v. U.S. Dep't of Just.*, 590 F.3d 272, 277 (4th Cir. 2010)). "The rationale is to enable parties with aligned interests to prepare their cases and 'coordinate their positions without destroying the privileged status of their communications.'" *Id.* (quoting Restatement (Third) of the Law Governing Lawyers § 76 cmt. b (Am. L. Inst. 2000).

"In order to establish the existence of a joint defense privilege, the party asserting the privilege must show that (1) the communication was made pursuant to a joint defense effort, (2) the statements were made to further the effort, and (3) the privilege has not been waived." *Minebea*, 228 F.R.D. at 16 (quoting *In re Bevill*, 805 F.2d at 126). "It is incumbent on a party claiming the joint defense privilege, therefore, to establish that 'the parties had agreed to pursue a joint defense strategy.'" *Minebea*, 228 F.R.D. at 16. Although "[a] written agreement is the most effective method of establishing the existence of a common interest agreement," it is not the only way to do so. *Intex*, 471 F. Supp. 2d at 16. An "oral agreement" can also supply "a

basis for the requisite showing." *Id.* The privilege also "permits an exchange of confidential information when the parties have clearly and specifically agreed in some [other] manner to pool information for a common goal." *Id.* at 16 (citation omitted). But in these latter circumstances, "the party's burden of proving that a statement was made in the common interest will undoubtedly be more difficult." *Id.* The party asserting the privilege bears the burden of proving the "existence, terms and scope" of any oral or implied common-interest agreement. *Intex*, 471 F. Supp. 2d at 16.

Evans has failed to produce evidence to support the existence of such an agreement. She appears to acknowledge that she and McDade never reduced any such agreement to writing, and instead contends that "Evans and McDade need not have a written agreement to have a 'common legal interest' and pursue 'a coordinated legal strategy.'" Opp'n at 6 (quoting *Intex*, 471 F. Supp. 2d at 17). Yet she offers no more than the outline of an argument for why she has proven a common-interest agreement with McDade exists in fact. Indeed, she asserts in a single sentence that the Court may infer an agreement because she "and McDade discussed suing Amtrak, retained the same counsel, and then filed charges asserting the same discrimination." Opp'n at 6. This argument fails several times over. For one thing, it is woefully underdeveloped. Evans fails to identify specific factual evidence in the record on which the Court could base findings concerning the "existence, terms and scope" of the putative common-interest agreement. *Intex*, 471 F. Supp. 2d at 16. "[A] litigant has an obligation to spell out its arguments squarely and distinctly," and "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

7

For another matter, the Court strains to see how the parallel conduct Evans describes, standing alone, *could* prove the "existence, terms and scope" of the putative common-interest agreement. *Intex*, 471 F. Supp. 2d at 16. The Court cannot conclude that McDade intended to enter a common-interest agreement from the mere facts that she hired the same lawyers as Evans — even if at the same time — and also filed a (separate) federal case. It is black-letter law that "[t]he conduct of a party is not effective as a manifestation of [her] assent unless [s]he intends to engage in the conduct and knows or has reason to know that the other party may infer from [her] conduct that [s]he assents." Restatement (Second) of Contracts § 19, (Am. L. Inst. 2024). And of course, the "mere[] . . . impression" of one party that a common interest agreement existed is not sufficient. *Minebea*, 228 F.R.D. at 16 (quoting *United States v. Weissman*, 195 F.3d 96, 100 (2d Cir. 1999)); *cf. id.* at 17 ("Proposing to another that a joint defense agreement be executed is no evidence of such a coordinated strategy or an agreement to jointly mount one."). Evans has not identified a sufficient factual basis to conclude that a common-interest agreement between her and McDade exists. And even if Evans could prove the existence of an agreement, "the scope of the agreement" must also be "clear," *ISS Marine Servs.*, 905 F. Supp. 2d at 127, and no evidence indicates, for example, the duration or subject-matter of any putative implied agreement. *Cf. Intex*, 471 F. Supp. 2d at 17 (holding that identical demand letters pertaining to alleged infringement of a discrete patent and sent on the same date by both parties to an implied common-interest agreement, "evidence[d] . . . [an] intent to enter into a 'coordinated legal strategy' to enforce the '469 patent" (citation omitted)).

If anything, the evidence in the record tends to suggest the *absence* of an agreement to "pursue a joint . . . strategy" or "pool information for a common goal." *Minebea*, 228 F.R.D. at 16. Evans appears to have disclaimed in deposition testimony that she and McDade had

strategized about how to pursue litigation against Amtrak. Specifically, Evans testified as follows:

> Q: In any of the communications that the two of you had, were they about your collective strategies for litigating your cases?
>
> A: When you say -- no. We -- no. So since she -- we have not talked about -- I have not talked about my -- like, this. Like, this situation with her.
>
> Q: The case?
>
> A: Like –
>
> Q: In general?
>
> A: I mean, I might have told her that I got counsel and, you know, I filed a EEOC charge.
>
> . . .
>
> Q: You had counsel and you filed an EEOC charge, you haven't had any conversations with [McDade] on the phone or by text where the two of you were discussing the actual litigation? Like your claims, the — the prosecution of these cases that the two of you have? None of that?
>
> A: We might have explained to each other what — why we were doing what we were doing, but it wasn't like advising each other.
>
> Q: Okay. And it wasn't helping one another pursue your claims?
>
> A: Not, not really.

Deposition of Tracy Evans at 179:8–180:13, ECF No. 25-2 ("Evans Dep."). Although neither the questions asked nor answers offered are a paragon of clarity, Evans certainly appears to disclaim that she was strategizing with McDade regarding the contemplated litigation when she answered negatively that she and McDade were not "helping one another pursue [their] claims." *Id.* at 180:11–12.

Evans disputes this interpretation of her testimony in her opposition filings, suggesting that the testimony establishes only that Evans "had not spoken to McDade recently or about the

9

current stage of her case," meaning the current federal litigation, "and that she could not recall what they had discussed about the case." Opp'n at 7. This characterization is not convincing, since the testimony hardly suggests she and McDade had shared a joint strategic pursuit *prior* to the filing of Evans's federal case either. *See* Evans Dep. at 179:18–19 ("I *might* have told her that I got counsel and, you know, I filed a EEOC charge." (emphasis added)). But more to the point, even if that was a fair characterization of the evidence, it offers no affirmative evidentiary basis for the Court to determine the "existence, terms and scope" of a common-interest agreement. *Intex*, 471 F. Supp. 2d at 16.

Invoking an unwritten common-interest agreement is "undoubtedly ... difficult." *Minebea*, 228 F.R.D. at 16. But that is because the common-interest doctrine, like "[a]ll privileges that protect against forced disclosure," is "not lightly created nor expansively construed, for [it is] in derogation of the search for truth." *ISS Marine Servs.*, 905 F. Supp. 2d at 127 (quoting *United States v. Nixon*, 418 U.S. 683 (1974)). "[I]t is certainly prudent practice to execute a written agreement before significant communications are exchanged," so as to "eliminate any doubt about whether the parties to the discussion were pursuing a common goal with respect to the matters communicated." *Minebea*, 228 F.R.D. at 16 (citation omitted). Absent evidence of any form of agreement, Evans has failed to supply a basis for withholding her text messages with McDade in this dispute.

## IV. CONCLUSION

For the foregoing reasons, the Court will **GRANT** the motion by separate order.

Date: December 5, 2025

/s/ Royce C. Lamberth
Royce C. Lamberth
United States District Judge